1
2
3
4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

5    MARÍA ALSINA ORTIZ, et al.,

6    Plaintiffs

7    v.                                                    CIVIL 98-1893 (CCC)

8    ZOÉ LABOY, et al.,

9    Defendants

10
11

<u>MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION</u>

12      This matter is before this court on defendants', Dr. Ernesto Torres, Dr. Elliot

13    Melecio, Dr. Aida Guzmán and Dr. Ileana Torres Mojica (hereinafter "defendants"),

14    motion for summary judgment filed on May 1, 2000. (Docket No. 95.) On July 27, 2000,

15    plaintiff María Alsina Ortiz (hereinafter "Alsina") filed a motion responding to defendants'

16    motion for summary judgment. (Docket No. 138.) Subsequently, defendants filed on

17    September 15, 2000, a reply to plaintiff's opposition. (Docket No. 159.) Plaintiff Alsina

18    asserts this civil rights action pursuant to 42 U.S.C. § 1983 claiming damages as a result

19    of an alleged violation of her decedent son's rights under the Eighth Amendment of the

20    United States Constitution. (Docket No. 95.) The defendants are two administrative

21    officials of the Health Correctional Program (Dr. Ernesto Torres and Dr. Ileana Torres), a

22    treating physician of the inmate (Dr. Elliot Melecio), and the Chief Health Care

23    Coordinator (Dr. Aida Guzmán). This case's factual background has previously been

24    proffered in a report and recommendation regarding plaintiff's motion for summary

25    judgment against defendants Zoe Laboy Alvarado and Sixto Marrero Rodríguez.

26      Complying with the requirements of Local Rule 311(12), the defendants submitted

27    the following:

28





1  CIVIL 98-1893 (CCC)                    2

2

3
<u>Defendant's Statement of Uncontested Facts</u>
4
1. Plaintiff's decedent, Orlando Ocasio Alsina had repeated admissions to the
5   Correctional System. See Administration of Corrections Intake Form, dated
    October 30, 1997, identified as Exhibit 1.
6   2. He had a history of chronic alcoholism and use of intravenous drugs. See
    Exhibit 1.
7   3. He was admitted to the Correctional System on October 30, 1997, for the
    crimes of theft and infraction of Article 404 of the Controlled Substances
8   Law. See Sentence entered on March 13, 1998 by Hon[orable] Carmen
    Vargas Medina regarding conviction of October 30, 1997, identified as
9   Exhibit 2.
    4. On November 8, 1997, a riot occurred [i]n Section "B" of Maximum II, in
10  Institution 308 of Bayamón, with the participation of 26 inmates, one of who
    was Orlando Ocasió Alsina.  See Report by Lt. Castillo Rosado, dated
11  November 10, 1997 regarding riot, identified as Exhibit 3; Report by Lt.
    Florentino Cepero, dated November 14, 1997, identified as Exhibit 4.
12  5. That same day after the situation was controlled, 26 convicts including
    Ocasio Alsina, were taken out of the building and conducted to the Medical
13  Area of the institution where they where treated by its medical personnel.
    See Exhibit 3 and Exhibit 4.
14  6. Of these inmates, five were referred to [the] Medical Center of Puerto Rico
    and the Regional Hospital of Bayamón. Orlando Ocasio Alsina was one of
15  these five inmates. See Exhibit 3 and Exhibit 4.
    7. On November 12, 1997, a CT-Scan of the head was performed on Orlando
16  Ocasio Alsina, which indicated that there was no evidence of traumatic
    intracranial pathology.  See CT-Scan Report dated November 12, 1997,
17  identified as Exhibit 5.
    8. On November 14, 1997, another CT-Scan of the head was done to Ocasio
18  Alsina where no sign of intracranial hemorrhage was detected. See CT-Scan
    Report, dated November 14, 1997, identified as Exhibit 6.
19  9. Orlando Ocasio Alsina was treated during the period of November 8, 1997
    to January 1, 1998 by the prison doctors at the Bayamón Correctional
20  Complex, the doctors at the Ramón Ruiz Arnauz Hospital and the Medical
    Center of Río Piedras. See co-defendants Dr. Ernesto Torres' Answer to
21  Plaintiff's Interrogatories, answer provided to interrogatory no. 2, identified
    as Exhibit 7.
22  10. Dr. Aida Guzmán Font was at the time of the facts alleged in the
    complaint the Chief Health Care Coordinator appointed by the Federal Court
23  for the District of Puerto Rico. See Aida Guzmán's Sworn statement, dated
    May 1, 2000, paragraph 2, identified as Exhibit 8.
24  11. As Chief Health Care Coordinator, Dr. Aida Guzmán was responsible for
    coordinating compliance with the provisions of the Medical Health Care Plan
25  and the Mental Health Plan, which establish health care standard of inmates
    and for overseeing, recommended revisions.  See Exhibit 8 at paragraph 3;
26  Medical Health Care Plan, section I(A)2 at page 1, identified as Exhibit 9.
    12. Dr. Aida Guzmán as Chief Health Care Coordinator, had no involvement
27  with the medical treatment of any particular inmate nor was she required to
    have any such involvement. See Exhibit 8 at paragraphs 6 and 7.
28

1  CIVIL 98-1893 (CCC)                              3

2

3

    13. Dr. Aida Guzmán had no involvement whatsoever with Orlando Ocasio
4   Alsina and only became aware of him through the instant action. See Exhibit
    8 at paragraph 10.
5   14. Dr. Aida Guzmán did not supervise any treating physician nor any of the
    co-defendants in this case. See Exhibit 8 at paragraph 5 and 7.
6   15. María Esther Ocasio Alsina and María Alsina Ortiz tried to call Dr. Aida
    Guzmán but they never spoke to her.  See Plaintiff's Answer to Co-
7   defendants Zoé Laboy, Sixto Marrero and Emilio Castillo Interrogatories,
    dated June 14, 1999, answer to interrogatory No. 10 at page 5, identified as
8   Exhibit 10.
    16. On December 30, 1997, Dr. Aida Guzmán was on vacation and did not
9   report to work. See Exhibit 8 at paragraph 8.
    17. Dr. Aida Guzmán had no knowledge of the alleged medical mistreatment
10  of Orlando Ocasio Alsina. See Exhibit 8 at paragraph 9.
    18. Dr. Ileana Torres was at the time of the facts alleged in the complaint an
11  administrative assistant to the Executive Director of the Correctional Health
    Program.  See Dr. Ileana Torres Sworn Statement, dated May 1, 2000 at
12  paragraph 2, identified as Exhibit 11.
    19. Dr. Ileana Torres' supervisor was Dr. Rafael Guzmán Fonalledas,
13  Executive Director of the Correctional Health Program. See Exhibit 11 at
    paragraph 3.
14  20. Dr. Ileana Torres was not a subordinate of Dr. Ernesto Torres, Dr. Elliot
    Melecio, Dr. Aida Guzmán nor any other co-defendant in the instant action.
15  She was not a physician. See Exhibit 11 at paragraphs 4 and 5.
    21. Dr. Ileana Torres has a doctorate degree in medicine, but does not have
16  a license to practice medicine. See Exhibit 11 at paragraph 6.
    22. As Administrative Assistant to the Executive Director, it was not Dr.
17  Ileana Torres' duty to coordinate medical treatment nor to receive complaints
    of perceived conditions of confinement or disagreement in the medical
18  treatment of inmates. See Exhibit 11 at paragraph 7.
    23. Dr. Ileana Torres' duties as Aid to the Executive Director were only of an
19  administrative nature. See Exhibit 11 at paragraph 8.
    24. Dr. Ileana Torres as Aid to the Executive Director had no supervisory
20  functions. See Exhibit 11 at paragraph 5.
    25. On December 15, 1997, María Esther Ocasio Alsina telephoned and
21  spoke with Dr. Ileana Torres for the first time. See Exhibit 10 at page 3.
    26. On December 15, 1997, Dr. Ileana Torres had a telephone conversation
22  with a family member of Orlando Ocasio Alsina in which the latter
    communicated to her the health condition of Orlando Ocasio as she perceived
23  it, including that he needed a wheelchair. See Exhibit 11 at paragraph 10.
    27. Dr. Ileana Torres became aware of Orlando Ocasio Alsina through a
24  telephone call from his relative. Had it not been for the telephone call Dr.
    Ileana Torres would not have had any reason to become aware of him. See
25  Exhibit 11 at paragraph 11.
    28. On December 15, 1997, based on the family member's indications
26  described in paragraph 10 of this sworn statement, and as per the instructions
    of Dr. Ileana Torres' supervisor, Dr. Rafael Guzmán Fonalledas, she called Dr.
27  Ernesto Torres and requested that he coordinate a medical evaluation of
    Orlando Ocasio and to evaluate the wheelchair request[.] See Exhibit 11 at
28  paragraph 12.

CIVIL 98-1893 (CCC)                    4

29. Dr. Ernesto Torres complied with the requests to coordinate a medical evaluation of Orlando Ocasio and to evaluate the wheelchair request. See Exhibit 11 at paragraph 13.

30. On December 30, 1997, María Alsina Ortiz went to the offices of Dr. Aida Guzmán but was not able to speak with her. She spoke to Dr. Ileana Torres. See Exhibit 10 at pages 3 and 5; Deposition of Mrs. María Virgen Burgos, dated November 4, 1999, page 55 at lines 12-17, identified as Exhibit 12; Deposition of Antonio Caratini Laboy, dated November 3, 1999, page 13 at lines 2-19, identified as Exhibit 13.

31. On December 30, 1997, while this meeting was underway, Dr. Ileana Torres called Dr. Ernesto Torres, as per the instructions of Dr. Rafael Guzmán, in order for the latter to take the necessary steps to transfer Orlando Ocasio out of Bayamón. See Exhibit 11 at paragraph 15.

32. Dr. Ernesto Torres complied with the transfer request and on January 1, 1998, Orlando Ocasio was admitted at the Infirmary of the Río Piedras Penal Hospital. See Exhibit 11 at paragraph 16.

33. On December 30, 1997, María Esther Ocasio Alsina and María Alsina Ortiz telephoned and spoke with Dr. Ileana Torres for the second and last time. See Exhibit 10.

34. On approximately December 30, 1997, María Alsina Ortiz told Dr. Ileana Torres and Dr. Rafael Guzmán of a court order to provide medical assistance to his son. See Exhibit 10.

35. After showing them the Court Order, they moved Orlando Ocasio Alsina to another medical facility. See Exhibit 10 at page 5; Deposition of Mrs. María Alsina Ortiz, dated November 16, 1999, page 60 at lines 13-25 and Page 61 at lines 1-4, identified as Exhibit 14.

36. María Alsina Ortiz never spoke to Dr. Elliot Melecio nor to any of his physicians. See Exhibit 14, page 58 at lines 2-7 and page 62 at lines 4-9.

37. Mr. Juan Alsina Ortiz did not speak with any medical professional regarding Ocasio's medical treatment. See Deposition of Mr. Juan Alsina Ortiz, dated November 4, 1999, page 14 at lines 7-18 and page 15 at lines 4-8, identified as Exhibit 15.

38. Mrs. María Virgen Burgos did not speak with any medical professionals regarding Orlando Ocasio's medical treatment. See Exhibit 12, page 12 at lines 19-24.

39. Dr. Ernesto Torres was at the time of the facts alleged in the complaint the Director of Clinical Services at the Bayamón Correctional Complex. See Sworn Statement of Dr. Ernesto Torres, dated, identified as Exhibit 16 at paragraph 2.

40. As Director of Clinical Services at the Bayamón Correctional Complex[,] Dr. Ernesto Torres oversaw the medical areas of the various correctional institutions in Bayamón. These were institutions 1072, 292, 308 and 448. See Exhibit 16 at paragraph 8.

41. Each of these institutions had their own medical directors and staff. See Exhibit 16 at paragraphs 8 and 9.

42. As Director of Clinical Services at the Bayamón Correctional Complex, Dr. Ernesto Torres performed administrative functions. See Exhibit 16 at paragraph 4.

43. As Director of  Clinical Services at the Bayamón Correctional Complex, Dr. Ernesto Torres had no direct involvement with the medical treatment

1  CIVIL 98-1893 (CCC)                                  5

2

3

4

provided to Orlando Ocasio Alsina or any other patient.  See Exhibit 16 at paragraph 6.

44. The clinical judgements of the physicians who worked in the Clinical Services at the Bayamón Correctional Complex were not evaluated nor had to be evaluated by Dr. Ernesto Torres.  See Exhibit 16 at paragraph 7.

45. Dr. Ernesto Torres supervisory functions solely concerned administrative matters.  See Exhibit 16 at paragraph 11.

46. Dr. Ernesto Torres was not the direct supervisor of the treating physicians in Bayamón but rather the aforementioned were supervised by the directors of the various medical areas.  See Exhibit 16 at paragraphs 9 and 10.

47. Dr. Ernesto Torres in no way supervised Dr. Elliot Melecio who worked in a facility different than the Bayamón Health Correctional Complex.  See Exhibit 16 at paragraph 12[.]

48. Orlando Ocasio's sister talked to Dr. Ernesto Torres.  See Exhibit 10.

49. On December 15, 1997, Dr. Ileana Torres communicated with Dr. Ernesto Torres as instructed by her supervisor Dr. Rafael Guzmán, the request for the purchase of a wheelchair and that an evaluation of Orlando Ocasio Alsina be performed to ascertain his medical condition.  See Exhibit 11 at paragraph 10; Exhibit 16 at paragraph 14.

50. Before December 15, 1999, Dr. Ernesto Torres had no knowledge of Orlando Ocasio's medical condition. See Exhibit 16 at paragraph 15.

51. Plaintiffs first tried to contact any medical professional regarding Orlando Ocasio in December through a telephone call to Dr. Aida Guzmán, who was not in but they spoke to Dr. Ileana Torres.  Plaintiffs first spoke with Dr. Ileana Torres on December 15, 1998. See Exhibit 14, page 51 at lines 5-23; Exhibit 10 at page 3.

52. On December 30, 1997, Dr. Ileana Torres communicated with Dr. Ernesto Torres as instructed by her supervisor Dr. Rafael Guzmán in order for him to take the necessary steps to transfer Orlando Ocasio out of Bayamón. Exhibit 11 at paragraph 15; Exhibit 16 at paragraph 16.

53. On December 1997, Dr. Ernesto Torres ordered that an evaluation of Orlando Ocasio Alsina be performed to ascertain his medical condition. Exhibit 16 at paragraph 17.

54. Pursuant to the visit of December 30, 1999 of Orlando Ocasio Alsina's relatives to Dr. Ileana Torres and Dr. Rafael Guzmán, Dr. Ileana Torres immediately responded to plaintiff's complaints.  See Deposition of María Esther Ocasio Alsina, dated November 3, 1999, page 18 at lines 6-13 and page 30 at lines 10 and 20, identified as Exhibit 18; Exhibit 14, page 60 at lines 13-25 and page 61 at lines 1-4; Exhibit 13, page 13 at lines 22-25, page 14 at lines 1-2 and at lines 14-20.

55. On December 30, 1997 Orlando Ocasio was transferred out of the Bayamón Correctional Institution and never returned.  From this time on he was not a patient of the Clinical Services at the Bayamón Correctional Complex.  See Exhibit 14, page 65 at lines 4-5.

56. Before December 15, 1997 no efforts were made by the plaintiff to contact medical personnel concerning the health condition of Orlando Ocasio Alsina.  See Exhibit 14 , page 51 at lines 5-23; Exhibit 10.

57. The first visit the family of Orlando Ocasio Alsina made to him in Bayamón was the Saturday after November 8 and the second visit was the following week.  See Deposition of Mrs. Gladys Ocasio Alsina, dated

CIVIL 98-1893 (CCC)                    6

November 4, 1999, page 20 at lines 10-25 and page 21 at lines 7-13, identified as Exhibit 19; Exhibit 12, page 6 at lines 6-12.

58. Mr. Orlando Ocasio Alsina was provided a wheelchair in Bayamón that was seen by the family members during their second visit to his son in Bayamón. See Exhibit 19, page 20 at lines 10-25 and page 21 at lines 7-13.

59. On December 17, 1997 another wheelchair was provided to Orlando Ocasio Alsina after being purchased as per the request of Dr. Ernesto Torres. Dr. Ernesto Torres acted immediately upon the request communicated to him by Dr. Ileana Torres. See Exhibit 7, answer provided to Interrogatory No. 7; See Exhibit 16 at paragraph 17; Wheelchair Delivery Receipt dated, identified as Exhibit 20.

60. Dr. Elliot Melecio Vega worked at the time of the facts alleged in the complaint as an internal medicine specialists at the Infirmary of Río Piedras Penal Hospital. See Sworn Statement of Dr. Elliot Melecio, dated May 1, 2000 at paragraph 2, identified as Exhibit 17.

61. Dr. Elliot Melecio Vega saw for the first time Orlando Ocasio Alsina on January 2, 1997 where he became the patient of the Infirmary of the Río Piedras Penal Hospital. See Exhibit 17 at paragraph.

62. Orlando Ocasio Alsina was referred to the Infirmary in the Río Piedras state Penitentiary by instructions of Dr. Rafael Guzmán. See Exhibit 11 at paragraphs 15 and 16.

63. Dr. Elliot Melecio sought the patient's records from which he learned of an evaluation performed in [the] Hospital Ruiz Arnauz, which diagnosed him as having cerebral infarct. See Exhibit 17 at paragraph 4; Internal Medicine Evaluation, dated December 15, 1997, identified as Exhibit 21.

64. Dr. Elliot Melecio after evaluating his medical history, which included his claim of having HIV and [the] presence of hemiparesis, he doubted the accuracy of the cerebral infarct prognosis. Consequently he decided to transfer him to the Medical Center of Puerto Rico for further evaluation. See Exhibit 17 at paragraph 5; Order of Transfer by Dr. Elliot Melecio, dated January 2, 1998, identified as Exhibit 53.

65. On that same [day], January 2, 1998, Orlando Ocasio Alsina was transferred to the Medical Center as ordered by Dr. Elliot Melecio. In his referral, Dr. Melecio requested that a CT-Scan with contrast be performed [since] he suspected that the patient had toxoplasmosis. See Exhibit 17 at paragraph 7; Radiology Report, dated January 2, 1998, identified as Exhibit 52.

66. Orlando Ocasio Alsina was diagnosed with toxoplasmosis by the doctors at The University Hospital and commenced on treatment. See Exhibit 17 at paragraphs 8 and 9; University Hospital Discharge Summary, dated January 16, 1998, identified as Exhibit 22; History and Physical Examination, dated January 16, 1998, identified as Exhibit 23.

67. Ocasio Alsina remained hospitalized at the University Hospital for approximately two weeks. See Exhibit 17 at paragraph 9 and Exhibit 22.

68. He was discharged from the University Hospital on January 16, 1998 with recommended treatment for his toxoplasmosis and aids conditions. See Exhibit 17 at paragraph 9; Exhibit 22; Medical Services Administration Prescription, dated January 16, 1998, identified as Exhibit 24.

69. On January 16, 1998, Orlando Ocasio was evaluated in the Emergency Room of the Río Piedras Hospital by Dr. Angel Avilés and on January 17,

1  CIVIL 98-1893 (CCC)                    7

2

3

4  1998, he prescribed the following treatment in agreement with the University Hospital recommendation; Folinic Acid, Daraprim, Tagamet, Clindamycin, and multivitamins. See Exhibit 17 at paragraphs 10 and 11; Progress note of admission, dated January 17, 1998 by Dr. Angel Avilés, identified as Exhibit 25; Physicians Order of Admission, dated January 17, 1998, identified as Exhibit 26.

5

6

7  70. Dr. Elliot Melecio saw Orlando Ocasio Alsina for the first time following his discharge from the University Hospital on Monday January 19, 1998. Dr. Melecio did not work on Saturdays, Sundays nor holidays. See Exhibit 17 at paragraph 12; Physician Treatment Order of Dr. Elliot Melecio, dated January 19, 1998, identified as Exhibit 27; Progress note of Admission Evaluation by Dr. Elliot Melecio, dated January 19, 1998, identified as Exhibit 28.

8

9

10  71. On January 19, 1998, Dr. Elliot Melecio evaluated the patient and was in agreement with the University Hospital recommendations. In addition, Dr. Melecio prescribed treatment for the HIV infection for which no medication was prescribed by the University Hospital doctors. This additional treatment included AZT, and Epivir and was in accordance with the protocol for the treatment of HIV. See Exhibit 17 at paragraph 14; Exhibit 27; Exhibit 28.

11

12

13

14  72. Dr. Elliot Melecio continued to treat Orlando Ocasio Alsina who at this time was diagnosed with Toxoplasmosis and AIDS, with medications for both conditions and also commenced him on physical therapies. See Exhibit 17 at paragraph 15; Exhibit 22; Exhibit 26; Physician Order of Physical Therapy of Dr. Melecio, dated January 21, 1998, identified as Exhibit 29; Physical Therapy Consult of Dr. Elliot Melecio, dated January 17, identified as Exhibit 30.

15

16

17  73. Upon his return from the Medical Center, Dr. Elliot Melecio evaluated the patient, engaged in a course of treatment and monitored his response to the treatment on a daily basis, excluding Saturdays, Sundays and holidays, and sometimes more than once a day. See Exhibit 17 at paragraph 16; Physician Orders of Dr. Elliot Melecio from January 17, 1998 to March 11, 1998, identified as Exhibit 31; Progress Notes of Dr. Elliot Melecio from January 20, 1998 to March 11, 1998, attached hereto as Exhibit 32; Discharge summary dated as of March 11, 1998, attached hereto as Exhibit 33.

18

19

20

21

22  74. During the period in which Orlando Ocasio spent in the Infirmary of one month and almost three weeks, he was examined by Dr. Elliot Melecio on more than thirty-eight (38) occasions. Exhibit 17 at paragraph 17; Exhibit 31, Exhibit 32; Exhibit 33.

23

24  75. The medical treatment provided by Dr. Elliot Melecio contributed to Orlando Ocasio's stability within his medical condition of having AIDS and Toxoplasmosis. See Exhibit 17 at paragraph 18; Exhibit 33; Progress note regarding discharge from Infirmary and transfer to Medical Dormitory by Dr. Melecio, dated March 11, 1998, identified as Exhibit 34; Nurses discharge summary from Infirmary, dated March 12, 1998, identified as Exhibit 35.

25

26

27  76. Upon Orlando Ocasio's condition being stable Dr. Elliot Melecio order his transfer to the Dormitory of the State Penitentiary on March 11, 1998. See Exhibit 17 at paragraph 19; Exhibit 33; Exhibit 34; Progress Note, dated March 11, 1998, attached hereto as Exhibit 36.

28

1  CIVIL 98-1893 (CCC)                    8

2

3

4      77. The Dormitory is a ten-bed unit monitored by a doctor and nurses who
       provide round-the-clock chronic care and monitoring of patients' medical
       conditions and which is better suited to care for patients with physical
5      limitations. See Exhibit 17 at paragraph 20.

       78. Upon Orlando Ocasio's discharge from the Infirmary, Orlando Ocasio was
6      alert, active, oriented, with clear lungs, normal vital signs, and with residual
       neurological changes, which referred to the continued hemi paresis.  See
7      Exhibit 17 at paragraph 22; Exhibit 36.

       79. Upon Orlando Ocasio's discharge, Dr. Elliot Melecio prescribed the
8      following:  for the treatment of toxoplasmosis Darapin 50mg three times a
       day, Folinic Acid 10mg once a day, Zitromax 500mg once a day; to control
9      convulsions Dilantin 100mg three times a day; for allergies Zyrtec 10mg once
       a day; for the treatment of HIV infection AZT 300mg twice a day and Epivir
10     150mg twice a day; and physical therapy three times a week. See Exhibit 17
       at paragraph 23; Exhibit 33; Exhibit 34.

11     80. The nurses' evaluation performed in Ocasio Alsina on March 12, 1998,
       the day following his arrival to the Dormitory showed that he felt good, he
12     was conscious, alert and calmed.  See Exhibit 17 at paragraph 24; Nurses
       Evaluation, dated March 12, 1998, identified as Exhibit 37.

13     81. Upon Orlando Ocasio's discharge, he ceased to be a patient of Dr. Elliot
       Melecio and of the Infirmary. In turn he was then under the care of Dr.
14     Deborah Aruz, treating physician at the Dormitory with whom Dr. Melecio
       bore no relationship except as colleagues who worked for separate and distinct
15     medical areas. See Exhibit 17 at paragraphs 21 and 25; Exhibit 35; Exhibit
       37.

16     82. Orlando Ocasio Alsina remained under the care of Dr. Deborah Aruz for
       approximately two months. See Physician Order to transfer to Puerto Rico
17     Medical Center by Dr. Deborah Aruz, dated April 28, 1998, identified as
       Exhibit 38.

18     83. On April 28, Dr. Deborah Aruz referred the patient to the PR Medical
       Center of Río Piedras. See Exhibit 17 at paragraph 26; Exhibit 38; Physicians
19     Order of Admission to the Medical Center, dated May 29, 1998, identified
       as Exhibit 39; Emergency Room Physician Evaluation, dated May 7, 1998,
20     attached hereto as Exhibit 40.

       84. He was admitted on April 28 and he remained hospitalized under the care
21     of the internal medical services a total of 9 days until his discharge.  See
       Exhibit 17 at paragraph 26; Exhibit 38; Exhibit 39; Exhibit 40.

22     85. Upon his discharge, he was transferred to the Emergency Room of the
       Penal Hospital of Río Piedras as admissions procedure required. See Exhibit
23     17 at paragraphs 10 and 27; Exhibit 40.

       86. On the evening of Friday the 8th of May 1998, the patient was transferred
24     to the Infirmary by order of Dr. Andino, emergency room physician.  See
       Exhibit 17 at paragraph 28; Physician order, dated May 8, 1998, identified
25     as Exhibit 41; Admission Sheet by Dr. Elliot Melecio, dated May 11,
       identified as Exhibit 42.

26     87. Dr. Elliot Melecio did not work on evenings. He also did not work on the
       9th, nor on the 10th of May 1998 as he did not work on Saturday nor
27     Sundays. See Exhibit 17 at paragraph 29.

       88. On the Monday morning of May 11, 1998 Orlando Ocasio Alsina is seen
28     again and for the first time after 2 months by Dr. Elliot Melecio.  See Exhibit

1   CIVIL 98-1893 (CCC)                    9

2

3
         17 at paragraph 30; Exhibit 42; Progress note of Dr. Elliot Melecio, dated
4        May 11, 1998, identified as Exhibit 43; Transfer Form of Dr. Elliot Melecio,
         dated May 11, 1998, identified as Exhibit 44.
5        89. On the Monday morning of May 11, 1998, Dr. Melecio found Orlando
         Ocasio comatose and in respiratory distress. See Exhibit 17 at paragraph 31;
6        Exhibit 43 and Exhibit 44.
         90. With the assistance of Dr. Andino, a doctor of the Emergency Room, Dr.
7        Elliot Melecio stabilized Orlando Ocasio Alsina and transferred [him] to the
         Medical Center. See Exhibit 17 at paragraph 32; Physician Order of Dr.
8        Elliot Melecio, dated May 11, 1998, identified as Exhibit 45.
         91. Dr. Elliot Melecio accompanied the Orlando Ocasio in the ambulance on
9        the way to the Medical Center and delivered him to Dr. Bermúdez at the
         emergency room. See Exhibit 17 at paragraph 33; Medical Center Admission
10       Room Evaluation by Dr. Bermúdez, dated May 11, 1998 at 9:48 a.m.,
         identified as Exhibit 46.
11       92. Upon his admittance to the Medical Center, Orlando Ocasio was no
         longer under the care of Dr. Elliot Melecio. See Exhibit 17 at paragraph 34.
12       93. On that same day of May 11, 1998, Ocasio Alsina was admitted to the
         University Hospital and was seen by a neurologist. His evaluation, stated
13       patient with toxoplasmosis with very poor prognosis. See Exhibit 17 at
         paragraph 35; Neurology Progress Note, dated May 11, 1998 at 4:00 p.m.,
14       identified as Exhibit 47; Physician Order of Admission, dated May 11, 1998,
         identified as Exhibit 51.
15       94. Orlando Ocasio died at the University Hospital on May 11, 1998. See
         Exhibit 17 at paragraph 36; Death Summary, dated May 11, 1998, identified
16       as Exhibit 48; Death Note, dated May 11, 1998, identified as Exhibit 49.
         95. His death summary stated that Ocasio Alsina was a patient with HIV
17       Infection (AIDS) with central nervous system toxoplasmosis. See Exhibit 48.
         96. Orlando Ocasio did not file [a] complaint within the institutional
18       complaints' committee ("quejas y agravios")[.] See Grievances Program
         certifications of no evidence of Orlando Ocasio having filed grievances, dated
19       the 17th, 18th, and 29th of September 1998, identified as Exhibit 50.

20   Docket No. 95, Defendants' Statement of Uncontested Facts.

21                                  Analysis

22       "The Eighth Amendment prohibits 'cruel and unusual punishments,' and 'it is now

23   settled that 'the treatment a prisoner receives in prison and the conditions under which he

24   is confined are subject to scrutiny under the Eighth Amendment.'" Giroux v. Somerset

25   County, 178 F.3d 28, 31 (1st Cir. 1999) (quoting Farmer v. Brennan, 511 U.S. 825, 832

26   (1994) (quoting Helling v. McKinney, 509 U.S. 25, 31 (1993))). "In order for a prison-

27   conditions complaint ... to state a violation of the Eighth Amendment, two requirements

28   must be met. First, the alleged deprivation of adequate conditions must be objectively

1    CIVIL 98-1893 (CCC)                          10

2

3
     serious, i.e., 'the inmate must show that he is incarcerated under conditions posing a
4
     substantial risk of serious harm.' ... Second, the official involved must have had 'a
5
     sufficiently culpable state of mind,' ... described as 'deliberate indifference' to inmate
6
     health or safety." Id. at 32 (footnote and citations omitted). See also Figueroa-Torres v.
7
     Toledo-Dávila, 232 F. 3d 270, 279 (1ˢᵗ Cir. 2000); Estelle v. Gamble, 429 U.S. 97, 106
8
     (1976), cert. denied, 434 U.S. 974 (1977). The term deliberate indifference means "that
9
     'a prison official cannot be found liable under the Eighth Amendment for denying an
10
     inmate humane conditions of confinement unless the official knows of and disregards an
11
     excessive risk to inmate health or safety.'" Giroux v. Somerset County, 178 F.3d at 32
12
     (qouting Farmer v. Brennan, 511 U.S. at 837).
13
             Defendants argue that plaintiff's statement of contested facts is unsupported by the
14
     evidence and therefore fails to present evidence holding responsible the co-defendants for
15
     violating Ocasio's Eighth Amendment rights. (Docket No. 159, at 8.) As to defendant
16
     Aida Guzmán, defendants claim that plaintiff has not contested that defendant Dr. Aida
17
     Guzmán held the position of Health Care Coordinator and in turn did not have any
18
     participation in providing or supervising the medical treatment given to any particular
19
     inmate. In addition, defendant argues that it still remains uncontested that Dr. Guzmán
20
     had no knowledge about Ocasio's condition nor the risk that he allegedly confronted at the
21
     correctional institution. (Docket No. 159, at 8.) Plaintiff claims that Dr. Guzmán
22
     breached her duties under the Medical Care Plan set forth by this court, in the Carlos
23
     Morales Feliciano case and failed to comply with the guidance and provisions detailed in
24
     such document. (Docket No. 138, at 15-16, ¶ 31.) She also allegedly failed to coordinate
25
     with the Administration of Corrections in order to provide Ocasio Alsina with security, to
26
     supervise that the correctional staff notify the medical staff on inmates transfer, provide
27
     and supervise health training and had the mutual responsibility for delivering health care
28

1    CIVIL 98-1893 (CCC)                11

2

3    to the inmates. (Docket No. 138, at 17-21.) Hence, plaintiff contends that the breach of

4    her duties was the proximate cause of Mr. Ocasio's damages. (Docket No. 138, at 16, ¶

5    31.) However, plaintiff has not presented evidence that supports the contention that Dr.

6    Aida Guzmán violated Ocasio's Eighth Amendment right. The allegations against

7    defendant Guzmán are speculative and conclusory since there is no evidence that

8    demonstrates how nor when the defendant violated Ocasio's constitutional right. Plaintiff

9    also does not proffer specific instances that substantiates the allegations against defendant

10   Guzmán. Thus, it still remains uncontested that co-defendant Aida Guzmán had neither

11   knowledge of nor involvement in Orlando Ocasio Alsina's medical care, and that she had

12   no participation in the medical treatment given to Ocasio.

13        Regarding co-defendant Dr. Ernesto Torres, plaintiff claims that he breached his

14   duty to guarantee medical services to the inmates, had the duty to comply and assure

15   compliance with the orders and the stipulations of the federal court in the case of Morales

16   Feliciano, and was responsible for all the administrative activities concerning the

17   correctional institution. (Docket No. 138.) While plaintiff makes reference to the duties

18   which defendant Dr. Torres was responsible for, she does not proffer evidence that

19   establishes a connection with the alleged acts/or omissions of defendant Torres and the

20   claimed violation of Ocasio's Eighth Amendment right. What the evidence does show is

21   that upon Dr. Torres' notification of Orlando Ocasio Alsina's medical needs, the defendant

22   immediately made the necessary adjustments to satisfy the inmate's request by providing

23   him with a wheelchair he had requested. (Docket No. 95, at 9.) Plaintiff also fails to

24   demonstrate that Dr. Torres was the physician in charge and responsible for the medical

25   attention that was being provided to Orlando Ocasio Alsina. Plaintiff's generic allegations

26   towards defendant Dr. Ernesto Torres do not create a genuine issue of material fact

27

28

CIVIL 98-1893 (CCC)                    12

regarding his knowledge of and/or involvement with the medical attention Ocasio was receiving while he was an inmate at the Bayamón Correctional Institution.

Plaintiff claims that Dr. Ileana Torres Mojica, along with defendants Elliot Melecio and Ernesto Torres, had the duty to guarantee hospital and medical services. Plaintiff argues that defendant Dr. Ileana Torres breached this duty and also failed to explain to the Clinical Medical Directors and the Administration of Correction about Law 25. Additionally, plaintiff claims that defendant's knowledge of Orlando Ocasio Alsina's medical condition and the lack of medical attention towards him from her part is the proximate cause of his death, therefore making her liable for the damages caused to Orlando Ocasio Alsina.  (Docket No. 138, at 25-26.)  Notwithstanding plaintiff's allegations towards defendant Dr. Ileana Torres, the evidence does not contest that defendant Ileana Torres was in fact instrumental in procuring medical attention to Ocasio when he requested it.  (Docket No. 95, at 8.)  In fact, the record shows that Dr. Ileana Torres telephoned Dr. Ernesto Torres twice requesting him to order the wheelchair that Orlando Ocasio Alsina had solicited. (Docket No. 95, at 9.) The evidence as well does not contest the fact that there is no causal connection between this defendant's actions and the Eighth Amendment violation nor that she had any supervisory responsibilities concerning medical treatment at the institution.  In sum, defendant Dr. Ileana Torres cannot be found liable for the quality of the medical treatment provided to Orlando Ocasio Alsina.

As to defendant Dr. Elliot Melecio Vega, plaintiff argues that he had the duty to guarantee hospital and medical services to the inmates as well as to comply and to assure compliance with the orders in the Carlos Morales Feliciano case.  Plaintiff also claims that this defendant is liable for the damages caused to Orlando Ocasio Alsina since he was directly involved and had supervisory responsibilities regarding Ocasio's medical attention and health.  Lastly, plaintiff argues that his deliberate indifference towards Ocasio's health

1  CIVIL 98-1893 (CCC)                              13

2

3   and his unwillingness to alleviate his condition was the proximate cause of his death.

4   (Docket No. 138, at 35-36.)  Notwithstanding the argument, there is no evidence in the

5   record that establishes that Dr. Elliot Melecio provided inadequate medical assistance to

6   Orlando Ocasio Alsina while he was under his  care.  The record shows that at the time

7   defendant Dr. Elliot Melecio was Ocasio's physician, he took all the necessary measures to

8   attend to his medical needs, such as monitoring his condition as well as evaluating his

9   health almost on a daily basis. (Docket No. 95,  at 14.) In addition, the record is void of

10  negligent or inadequate medical treatment on behalf of this defendant.  On the contrary,

11  the record shows that once Ocasio was transferred on that same day from Bayamón to the

12  infirmary and after he had evaluated Ocasio's medical history,  Dr. Elliot Melecio ordered

13  Ocasio's transfer to the Medical Center at Río Piedras for further evaluations which

14  included a CT-Scan.  (Docket No. 95, at 13.) Upon Ocasio's return from the Medical

15  Center, Dr. Elliot Melecio continued to give Ocasio the same treatment given to him at the

16  Center, as well as an additional treatment for his HIV infection that had not been

17  prescribed to him while at the Medical Center. (Docket No. 95, at 14.) The record shows

18  that during the time Orlando Ocasio Alsina was at the infirmary and under the care of

19  Dr. Elliot Melecio, he was examined on more than thirty-eight occasions.  At the time he

20  was discharged from the infirmary Ocasio was alert and stable and Dr. Elliot Melecio had

21  ordered a course of treatment that involved numerous medications.[1]

22       Plaintiff has failed to contest that the medical treatment given to Orlando Ocasio

23  Alsina by Dr. Elliot Melecio was improper or was negligently carried out.  In sum, what the

24

25  _____

26       [1]For the treatment of Ocasio's toxoplasmosis Dr. Elliot Melecio ordered:  Darapin
    50mg three times a day, Folinic acid 10mg once a day, Zitromax 500mg once a day; to

27  control  convulsions Dilatin 100mg three times a day; for allergies Zyrtec 10mg once a day;
    for the treatment of HIV infection AZT 300mg twice a day and Epivir 150mg twice a day;

28  and physical therapy three times a week. (Docket No. 95, at 15.)

1    CIVIL 98-1893 (CCC)                          14

2

3    evidence does reflect is Dr. Elliot Melecio's willingness to alleviate and treat Ocasio's

4    medical condition rather than intentionally disregard Ocasio's medical needs with

5    deliberate indifference. Hence, it remains uncontested that co-defendant Elliot Melecio

6    was always actively involved in Ocasio's treatment and never hesitated to afford Ocasio the

7    proper medical care he needed. As a result, plaintiff's claim of deliberate indifference

8    against the defendant fails.

9         It is well established that a complaint in which it is claimed that a "physician has

10   been negligent in diagnosing or treating a medical condition does not state a valid claim of

11   medical mistreatment under the Eighth Amendment." Estelle v. Gamble, 429 U.S. at 106.

12   "Medical malpractice does not become a constitutional violation merely because the victim

13   is a prisoner." Id. Plaintiff has failed to demonstrate that defendants' acts or omissions

14   towards Orlando Ocasio Alsina's medical condition resulted in deliberate indifference to

15   his constitutionally protected rights as well as that the medical attention provided to him

16   was not adequate. Hence, being unable to establish that Orlando Ocasio Alsina was

17   deprived of adequate medical services while at the Bayamón Correctional Institution due

18   to defendants' acts or omissions, that defendants had done so with knowledge and

19   conscious disregard of his medical condition, as well as that defendants violated Ocasio's

20   Due Process claim, plaintiff's claim against the defendants cannot stand up to the motion

21   for summary judgment. In addition, plaintiff's supplemental claim under Article 1802 and

22   1803 of the Civil Code of Puerto Rico, 31 L.P.R.A. §§ 5141 and 5142, should also be

23   dismissed. The assertion of supplemental jurisdiction over state law claims is within the

24   federal court's discretion. Méndez Marrero v. Toledo, 968 F. Supp. 27, 34 ( D.P.R. 1997);

25   see also O'Connor v. Commonwealth Gas Co., 251 F.3d 262, 273 (1st Cir. 2001); Pejepscot

26   Indus. Park Inc. v. Maine Cent. R. Co., 215 F.3d 195, 206 (1st Cir. 2000). If federal law

27

28

1  CIVIL 98-1893 (CCC)                    15

2

3
   claims are dismissed before trial, however, the state law claims should also be dismissed.
4
   Rodríguez v. Doral Mortage Corp., 57 F.3d 1168, 1177 (1st Cir. 1995).
5
        In view of the above, I recommend that the motion for summary judgment filed by
6
   defendants Dr. Elliot Melecio, Dr. Ernesto Torres, Dr. Aida Guzmán and Dr. Ileana Torres
7
   be GRANTED and that the supplemental claims be DISMISSED.
8
        Under the provisions of Rule 510.2, Local Rules, District of Puerto Rico, any party
9
   who objects to this report and recommendation must file a written objection thereto with
10
   the Clerk of this Court within ten (10) days of the party's receipt of this report and
11
   recommendation.  The written objections must specifically identify the portion of the
12
   recommendation, or report to which objection is made and the basis for such objections.
13
   Failure to comply with this rule precludes further appellate review.  See Thomas v. Arn, 474
14
   U.S. 140, 155 (1985), reh'g denied, 474 U.S. 1111 (1986); Davet v. Maccorone, 973 F.2d
15
   22, 30-31 (1st Cir. 1992); Paterson-Leitch Co. v. Massachusetts Mun. Wholesale Elec. Co.,
16
   840 F.2d 985 (1st Cir. 1988); Borden v. Secretary of Health & Human Servs., 836 F.2d 4,
17
   6 (1st Cir. 1987); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); United States v.
18
   Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Park Motor Mart, Inc. v. Ford Motor Co., 616
19
   F.2d 603 (1st Cir. 1980).
20
        At San Juan, Puerto Rico, this 23rd day of July, 2002.
21

22

23                              JUSTO ARENAS
                          United States Magistrate Judge
24

25

26

27

28