IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

MARIA ALSINA ORTIZ, ET ALS.
**Plaintiff(s)**

v.                                                         CIVIL NO. 98-1893(JAG)

ZOE LABOY, ET ALS.
**Defendant(s)**

### OPINION AND ORDER

Plaintiff Maria Alsina Ortiz ("Alsina") brought suit on August 5, 1998 pursuant to 42 U.S.C. §1983, alleging that defendants violated her son, Orlando Ocasio Alsina's ("Ocasio"), Eighth Amendment right to be free from cruel and unusual punishment. Defendants are Zoe Laboy ("Laboy"), Sixto Marrero ("Marrero"), Aida Guzman ("Guzman"), Emilio Castillo ("Castillo"), Ileana Torres-Mejica ("Torres-Mejica"), Ernesto Torres Arroyo ("Torres-Arroyo") and Elliot Melecio Vega ("Melecio")(collectively "co-defendants"). Before the Court are two motions for summary judgment (Docket Nos. 94 & 95). Alsina filed two major oppositions (Docket Nos. 111 and 138) to which defendants filed replies (Docket Nos. 158 and 159). Alsina has also filed multiple supplemental oppositions (Docket Nos. 175, 182, 183, 224, 229).

On January 30, 2002, this Court referred the pending motions to Magistrate Judge Justo Arenas for a Report and Recommendation. Magistrate Judge Arenas issued two opinions recommending that both motions for summary judgment be granted and that the complaint be dismissed as to all defendants (Docket Nos. 243 & 244).[1] Alsina filed two sets of objections to the

---

[1] The Magistrate Judge did not consider the claims against co-defendant Emilio Castillo since he was not a party to the motion for summary judgment. On November 21, 2002, Castillo

1

Magistrate Judge's recommendations (Docket Nos. 245 & 246) and co-defendants filed a reply (Docket No. 252). Upon review of the record, and concurring with Magistrate Judge Arena's analysis, the Court GRANTS summary judgment as to all defendants and dismisses this case with prejudice.

## SUMMARY JUDGMENT STANDARD

The standard for summary judgment is governed by Fed. R. Civ. P. 56. The court should grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ. P. 56(c); see Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000). The party moving for summary judgment bears the burden of showing the absence of a genuine issue of material fact. Celotex Corp.. v. Catrett, 477 U.S. 317, 323 (1986). A contested fact is 'material when it has the potential to change the outcome of the case. Vega-Rodriguez v. Puerto Rico Tel. Co., 110 F.3d 174, 178 (1st Cir. 1997). An issue is genuine if a reasonable jury could resolve the dispute for the nonmoving party. Cortés-Irizarry v. Corporación Insular, 111 F.3d 184, 187(1st Cir. 1997); Anderson v. Liberty Lobby. Inc., 477 U.S. 242, 248 (1986).

In order to defeat a motion for summary judgment, the party opposing the motion must "present definite, competent evidence to rebut the motion." Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994). The non-moving party must show that a trial-worthy issue exists and must point to specific facts that demonstrate the existence of an authentic dispute. Mesnick v.

---

filed a motion to join the summary judgment filed by co-defendants Laboy and Marrero (Docket No. 268). The Court granted the motion to join on September 12, 2003 (Docket No. 276).

General Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991). "The mere existence of a scintilla of evidence is insufficient to defeat a properly supported motion for summary judgment." Anderson, 477 U.S. at 252. Furthermore, the Court "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). Nonetheless, the Court must never "weigh the evidence and determine the truth of the matter," Lipsett v. University of P.R., 864 F.2d 881, 895 (1st Cir. 1988) (quoting Anderson, 477 U.S. at 249), and "[n]o credibility assessment may be resolved in favor of the party seeking summary judgment." Woodman v. Haemonetics Corp., 51 F.3d 1087, 1091 (1st Cir. 1995). The Court may safely ignore "conclusory allegations, improbable inferences, and unsupported speculation." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990). "If, after this canvassing of the material presented, the district court finds that some genuine factual issue remains in the case, whose resolution one way or another could affect its outcome, the court must deny the motion." Lipsett, 864 F.2d at 895.

## LOCAL RULE 311.12

In compliance with Local Rule 311.12, defendants submitted "a separate, short concise statement of material facts as to which the moving party contends there is no genuine issue to be tried and the basis for such contention as to each material fact, properly supported by specific references to the record." D.P.R.R. 311.12 (See Docket Nos. 94, 95). Alsina's own statement of contested facts is defective and fails to comply with the clear language of the local rule. It is far from short or concise, it lacks specific references to the record and attempts to respond to defendants proposed uncontested facts rather than setting out the factual issues that she asserts remain contested for purposes of summary judgment.

3

A mere overview of the record before this Court reveals plaintiff's gross noncompliance with the local rule. Instead of filing an opposition accompanied with a statement of contested facts, Alsina filed multiple repetitive oppositions and purported statements of contested facts (See Docket Nos. 111, 134, 138, 182). The sheer volume of the documents submitted by Alsina in opposition to defendants motions is indicative of her failure to abide by the clear mandate of the local rule which requires that the statement of contested facts be short and concise to support the existence of triable material issues of fact. Alsina's initial opposition to the motion for summary judgment filed by co-defendants Marrero and Laboy, and its accompanying exhibits, comprises more than six (6) files. The statement of facts consists of twenty eight (28) pages and forty seven (47) proposed facts (Docket No. 11). The statement of contested facts submitted in response to the motion filed by the other co-defendants in the case consists of one hundred and seventeen (117) proposed facts in one hundred and twenty three (123) pages. ( Docket Nos. 134). In total, plaintiff filed six separate statements of contested facts (See Docket Nos. 111, 134, 175, 182, 229 and 269) including well over two hundred (200) allegedly contested facts.

In addition, Alsina's references to the record are vague and incomplete. She cannot expect the Court to ferret first through the multiple oppositions and defective statements of contested facts, and then to such a voluminous record without clear, precise and specific references that demonstrate the existence of genuine issues of material fact. In many instances, she cites merely to the Exhibit without the corresponding page numbers. Moreover, many of the proposed facts submitted by Alsina are in fact argumentative. For example, Alsina cited in multiple occasions to certain expert witnesses whose testimony bears little, if any, relationship to the facts in controversy for purposes of summary judgment.

4

It is well-established that "a list of facts with no specific references to the record is of no use to the Court." Hogar Club Paraiso, Inc. v. Varela Lavona, 208 F.R.D. 481, 482 (D.P.R. 2002). Plaintiffs cannot expect the Court to "ferret through the record, read all the answers to interrogatories, study all the attached documents and carefully scrutinize all the depositions for lurking genuine issues of material fact." Dominguez v. Eli Lilly & Co., 958 F. Supp. 721, 727 (D.P.R. 1997).

Local Rule 311.12 provides that the "moving party's statement will be deemed to be admitted unless controverted by the statement required to be served by the Opposing Party." D.P.P.R 311.12. Clearly, "parties who ignore Rule 311.12 do so at their own peril," Hogar Club Paraiso, 208 F.R.D. at 482 (*citing* Velez v. Puerto Rico Electric Power Authority, 170 F.Supp. 2d 158, 162 (D.P.R. 2001)), and "once so warned, a party s failure to comply would ... be grounds for judgment against that party." Nieves-Avala v. Johnson & Johnson, 208 F. Supp.2d 195, 198 (D.P.R. 2002); Morales v. A.C. Orssleffs EFTF, 246 F.3d 32, 33 (1st Cir. 2001). Accordingly, the Court hereby admits all the facts, submitted by defendants, which have been adequately supported by references to the record.

## FACTUAL BACKGROUND

On November 8, 1997, a riot occurred at the Bayamon Regional Metropolitan Institution, also known as "308." Ocasio suffered a blow to the head. The riot required the intervention of prison officials and the use of tear gas. As a result of the riot, twenty six inmates (26), including Ocasio, were taken to the Medical Area of the Institution for treatment. Five of those inmates, including Ocasio, were later transferred to outside medical facilities for treatment. Ocasio went to the Bayamon Regional Hospital (Ramon Ruiz Arnau Hospital). On November 12, 1997, medical personnel at the

5

Bayamon Regional Hospital performed a CT Scan on Ocasio which revealed no evidence of traumatic intra cranial pathology. A second CT scan performed two days later also showed no sign of intra cranial hemorrhage. The personnel at the Bayamon Regional Hospital released Ocasio on November 15, 1997. Upon his release, Ocasio returned to his cell.

On December 15, Alsina called the office of Aida Guzman. She spoke to Ileana Torres and informed her that the right side of Ocasio's body was completely paralyzed and that he was dying. Alsina asked that a wheelchair be provided to him. Ileana Torres arranged for Emesto Torres to coordinate a medical evaluation of Ocasio and to act on the wheelchair request. On December 17, 1997, Emesto Torres delivered a wheelchair to inmate Ocasio.

During a visit to the Bayamon Correctional Complex on December 30, 1997, Alsina requested that Ocasio be transferred out of Bayamon to the Infirmary at the Rio Piedras State Penitentiary Hospital. This request was granted on January 1, 1998. The next day, Melecio examined Ocasio and diagnosed him with Toxoplasmosis and AIDS. The patient's record delivered to Melecio indicated a cerebral infarct diagnosis. Upon an evaluation of his medical history, Melecio concurred with the cerebral infarct prognosis and decided to transfer Ocasio to the Medical Center for further evaluation. Consequently, on January 2, Ocasio was transferred to the Medical Center, and upon Melecio's referral request, medical personnel there performed yet another CT scan. The personnel at the Medical Center diagnosed Ocasio with toxoplamosis and commenced treatment.

Ocasio remained hospitalized at the Medical Center for approximately two weeks. He was discharged on January 16, 1998 with recommended treatment for toxoplasmosis and AIDS. His medication regimen included Folinic Acid, Daraprim, Tagamet, Clindamycin and multivitamins. On January 19, Melecio again saw Ocasio and agreed with the Medical Center recommendations.

6

Additionally, Melecio prescribed treatment for the HIV infection including AZT and Epivir. Melecio also ordered that Ocasio commence physical therapy. On March 11, 1998, Melecio ordered that Ocasio be transferred to the Dormitory of the State Penitentiary. At the time, Ocasio was alert, active, oriented with normal vital signs. The Dormitory is a ten bed unit monitored by a doctor and nurses who provide round the clock chronic care and monitoring of patients' medical conditions. Ocasio remained there until April 28, 1998, when he was referred back to the Medical Center.

Ocasio died on May 11, 1998. His autopsy reveals the cause of death as necrotizing encephalitis associated with AIDS.

## DISCUSSION

Co-defendants move for summary judgment on the basis that their actions did not rise to the level of deliberate indifference required to establish that medical mistreatment constitutes a violation of the Eighth Amendment. Alsina contends that co-defendants recklessly and deliberately failed to provide medical attention to Ocasio. For the reasons set forth below, the Court concludes that co-defendants' actions did not rise to the level of deliberate indifference and that the claims against them should be dismissed.

The standard for evaluating Eighth amendment violations is that of deliberate indifference. The Supreme Court has set forth the deliberate indifference inquiry in two seminal cases: Estelle v. Gamble, 429 U.S. 97 (1976), and Farmer v. Brennan, 511 U.S. 825 (1994). Estelle recognized that the government's failure to provide medical care for those whom it is punishing by incarceration could constitute a violation of the Amendment's mandate against cruel and unusual punishment. Estelle, 429 U.S. at 103; see also Helling v. McKmnnev, 509 U.S. 25 (1993). The "treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny

under the Eighth Amendment." Giroux v Somerset County, 178 F.3d 28,31 (1st Cir 1999).

In Farmer, the Court elaborated a two-prong test to determine whether a deprivation, such as failing to attend to a prisoner's medical needs, rose to the level of a constitutional violation: (1) the alleged deprivation must be objectively and sufficiently serious and, (2) the defendants must have a culpable state of mind, meaning that the defendant was deliberately indifferent to the inmate's health or safety. See Giroux, 178 F.3d at 32; Dennison v. Prison Health Services, 2002 WL 31026529 (D. Me.)(*citing* Farmer, 511 U.S. at 834).

In other words, Alsina must first establish the elements of a §1983 action, namely that: (1) defendants were acting under color of state law; (2) that he was in fact deprived of a federally protected right, and (3) that defendants were personally involved in the violation. Caraballo-Cordero, 91 F.Supp. 2d at 489; Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 559 (1st Cir. 1989). To prove that he was in was in fact deprived of a federally protected right, Alsina must also establish a violation of the Eighth amendment under the deliberate indifference standard. To do so, she must demonstrate that the conditions of her son's incarceration posed a substantial risk of serious harm and that the defending officials were deliberately indifferent to that risk, thereby compromising Ocasio's health or safety. See Giroux, 178 F.3d at 31; Figueroa-Torres v. Toledo Davila, 232 F.3d 270, 279 (1st Cir. 2000).

Deliberate indifference is defined as: (1) a grave risk of harm; (2) the defendant's actual or constructive knowledge of that risk; and (3) his failure to take easily available measures to address the risk." Camilo-Robles v. Hoyos, 151 F.3d 1, 7 (1st Cir. 1998) (*citing* Manarite v City of Springfield, 957 F2d 953,956 (1st Cir. 1992)); Febus-Rodriguez, 14 F.3d at 91 (Noting that mere negligence is insufficient for a finding of supervisory liability). The official must know of and

disregard an excessive risk to inmate health or safety, meaning he must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and must also draw the inference. Farmer, 511 U.S. at 837; see also Giroux, 178 F.3d at 32. "A prison official's failure to alleviate a significant risk that he should have perceived but did not is insufficient to establish an Eighth Amendment violation." Pubill-Rivera, 218 F Supp.2d 89, 94 (D.P.R. 2002). A wanton decision to deny or delay care may constitute deliberate indifference only if the action is reckless in the sense that it requires actual knowledge of impending harm that is easily preventable. See Watson v. Caton, 984 F.2d 537, 540 (1st Cit. 1993) (*citing* Wilson v Seiter, 501 US 294 (1992)); see also DesRosiers v Moran, 949 F.2d 15, 19 (1st Cir. 1991). "The requisite state of mind may be manifested by the official s response to an inmate's known needs or by denial, delay or interference with prescribed health care." Id. *(citing* Estelle, 429 U.S. at 104-5). Nonetheless, "determining the wantonness of the defendants' conduct depends not upon its effects on the inmate, but rather on the practical constraints facing prison officials and doctors." Muniz-Souffront, 115 F. Supp.2d at 242. To establish deliberate indifference, Alsina must establish that each of the defendants knew that Ocasio was at risk and decided to do nothing to prevent that harm from occurring, even though they could have easily done so. Verser v. Elvea, 113 F. Supp. 2d 1211,1214 (1st Cir. 2000).

As a preliminary matter, it is clear that Ocasio's condition constituted a serious medical need. See Gaudreault v. Municipality of Salem. Mass., 923 F.2d 203, 208 (1st Cir. 1990) (holding that a serious medical need is one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention); see also Muñiz-Souffront v. Labov Alvarado, 115 F. Supp.2d 237,242 (D. P. R. 2000)("A medical need is serious if it causes extreme pain, results in death or degeneration."). To prevail,

Alsina must allege enough facts to support an inference that the defendants subjectively and intentionally disregarded Ocasio's need for medical care.

The co-defendants in this case can be grouped into two sets. First, there are Laboy, Marrero, and Guzman. The liability of these defendants is premised on a theory of supervisory liability. The remaining defendants are Castillo, Torres-Mojica, Torres and Melecio. The latter group had more direct contact with Ocasio. Alsina must establish that each of these co-defendant's acts or omissions deprived Ocasio of his protected rights. Muniz-Souffront, 116 F. Supp.2d at 241.

**1. Supervisory Liability of co-defendants Laboy, Marrero and Guzman**

Because there is no *respondeat superior* liability under section § 1983, Maldonado Denis v. Castillo Rodriguez, 23 F.3d 576,581 (1st Cit. 1994) (*citing* Monell v. Dep't of Social Servs., 436 U.S. 658,691, 98 S. Ct. 2018, 2036, 56 L.Ed.2d 611(1978)); Caraballo-Cordero, 91 F.Supp. 2d at 489; Pinto v. Nettleship, 737 F.2d 130, 132 (1st Cir. 1984) a plaintiff may only hold a supervisory official accountable for his own acts or omissions under a theory of supervisory liability. Caraballo Cordero, 91 F.Supp. 2d at 489; Pinto, 737 F.2d at132.

To find a supervisor liable under §1983, a plaintiff must show that: (1) that the supervisor's acts or omissions deprived the plaintiff of a constitutionally protected right, (2) that his action or inaction amounted to a reckless disregard or callous indifference to the constitutional rights of others, (3) that there was an affirmative link between the street level misconduct and the action or inaction of the supervisory official. Caraballo-Cordero, 91 F.Supp. 2d at 490; Adorno-Colon, 137 F.Supp. 2d at 42; Gutierrez-Rodriguez, 882 F.2d at 562.

Laboy was the Administrator of the Administration of Corrections at the time of the facts alleged in the complaint. Alsina alleges that co-defendant Laboy can be imputed with knowledge

of Ocasio's condition because she was in the *Carlos Morales Feliciano* case and was aware that inmates were not receiving proper medical attention. Similarly, co-defendant Aida Guzman was the Health Care Coordinator appointed by this Court in the *Carlos Morales Feliciano* case. Alsina alleges that Guzman breached her duties under the Medical Care Plan established by the Court in that case. Sixto Marrero was the Sub Director of the Bayamon Correctional Complex at the time of the events. As such, he was responsible for the general supervision and coordination throughout the various institutions. Plaintiffs argue that Marrero was also responsible for the daily operations and can be therefore liable for the failure to provide adequate medical care to Ocasio.

As the Magistrate Judge correctly pointed out, there is no evidence that knowledge of the *Carlos Morales Feliciano* case automatically establishes defendants' knowledge regarding the medical care given to specific inmates at the Bayamon Correctional Institution. Alsina has failed to establish that co-defendant Laboy or Guzman had any particular knowledge regarding the events in the case or the particular medical care Ocasio's condition required. In fact, Alsina even fails to establish that they had any participation in supervising the medical care given to inmates, much less in the specific case of Ocasio. Alsina fails to aver specific instances to support her allegations against Laboy or Guzman. As the Magistrate judge correctly noted, "the allegations against Guzman [and Laboy] are speculative and conclusory" (Docket No. 244 at 11).

As to defendant Sixto Marrero, Alsina has failed to contest that he was responsible for the daily operations of the institution in addition to general supervision and coordination (See Docket No. 243 at 7). The Magistrate Judge found that the uncontested facts revealed that the Department of Health was the entity responsible for delivering medical assistance to inmates, such that Marrero and Laboy, as Administration of Corrections personnel, were not responsible for delivering medical

11

care to Ocasio. Moreover, neither Laboy nor Marrero are trained medical professionals that could discern the adequacy of the medical treatment given to Ocasio. Without any particular instances that establish that Laboy, Guzman or Marrero had the requisite knowledge and involvement in the medical care provided to Ocasio, there can be no §1983 liability.

**2. Liability of Defendants Castillo, Torres, Torres Mojica, and Melecio**

Alsina alleges that Castillo was a correctional officer who was located at a vantage point where he could see and hear Ocasio. Castillo was aware of the situation regarding Ocasio's condition after the riot and he allegedly failed to take any action despite listening to Ocasio 's screams and complaints of pain. There is testimony that during an argument, Ocasio blamed Castillo for the condition he was in. Notwithstanding, these allegations are insufficient to establish the liability of Castillo. First, as in the case of Laboy and Marrero, there is no evidence that Castillo was trained in the medical profession or otherwise capable of ascertaining and treating Ocasio's ailments. Alsina has not alleged that Ocasio asked him to seek medical help and that he failed to do so. Similarly, the record fails to indicate exactly when Castillo allegedly ignored Ocasio's complaint of pain in relation to the times when he was under medical supervision. It appears that Ocasio was already partially paralyzed and in pain, when he was placed near Castillo's supervision. Despite Castillo's apparent knowledge of the pain Ocasio was in, Alsina provides no specific indication regarding what Castillo could have done to alleviate Ocasio's condition which appeared to have already been treated by medical personnel at the time.

Dr. Ileana Torres-Mojica was an administrative assistant to the Executive Director of the Correctional Health Program. Alsina contends that Torres-Mojica was also responsible for guaranteeing medical care to inmates. The uncontested facts reveal, however, that Torres-Mojica

procured medical attention for Ocasio. She received the calls from Alsina's family and then telephoned Ernesto Torres to ensure that he delivered the wheelchair that Ocasio had solicited. While Torres-Mojica may be attributed knowledge of Ocasio's general condition, there is no indication that she was a physician in charge of his care or aware of the specifics of his illness. Consequently, her procurement of help suffices and there is no causal connection between her actions and the alleged deprivation of Ocasio's rights.

Similarly, Torres was the Director of Clinical Services at the Bayamon Correctional Institution. Alsina references Torres' alleged duty to comply with the orders of the *Morales Feliciano* case to link him to the alleged deprivation of Ocasio's Eighth amendment rights. The evidence establishes however, that when Torres received notice of Ocasio's medical needs, he promptly made the requisite calls to fulfill them. Torres personally delivered to Ocasio the wheelchair he had requested. He fulfilled the administrative duties required of him like scheduling a medical visit and providing a wheelchair to Ocasio. It is well established that even when a defendant knows of a substantial risk to an inmate's health or safety and he fails to prevent the harm, he may be found not liable if he responds reasonably to the risk. See Giroux, 178 F.3d at 32 (*citing* Farmer, 511 U.S. at 844. Consequently, the uncontested facts establish that Torres-Mojica and Torres responded reasonably to Ocasio's condition by responding reasonably to his needs. Moreover, there is no evidence to establish that either Castillo, Torres-Mojica or Torres were the physicians in charge of Ocasio's medical treatment nor that they had any particular knowledge regarding the specifics of his condition.

It is noteworthy that these co-defendants did not play a significant role in the decisions regarding the particulars of Ocasio's treatment. See generally Pelletier v. Magnusson, 201 F.

13

Supp.2d 148 (1st Cir. 2002) (Holding that medical doctor was not liable for inmate's suicide because he did not have a significant role in the mental health treatment of the inmate despite being director of medical services and having personally treated inmate). They were called upon to coordinate a medical consultation and provide a wheelchair and that is precisely what they did.

On the other hand, Melecio was one of the doctors who treated Ocasio. Accordingly, Alsina has properly established that Ocasio was directly involved and responsible for the medical care provided to Ocasio. Notwithstanding, the evidence in the record reveals that Melecio also properly fulfilled his duties under the amendment and provided adequate medical assistance to Ocasio. As Ocasio's medical physician, Melecio took multiple measures to treat his conditions. The record reveals that Melecio examined Ocasio on more that thirty eight occasions in the span of less than two months. He prescribed medications, ordered CT scans and monitored his condition on an almost daily basis. The record also reveals that when Melecio discharged Ocasio from the infirmary, he was alert and stable and was under a rigorous course of treatment including multiple medications for his conditions and the HIV infection. Alsina has failed to establish the Melecio's course of treatment was improper. Even if one were to assume that Melecio could have done something more to alleviate Ocasio's condition it is well established that a physician's negligence in diagnosing or treating a medical condition does not present a colorable Eighth Amendment claim. Estelle, 429 US at 106. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." Estelle, 429 U.S. at 106. "Courts have consistently refused to create constitutional claims out of disagreement between prisoners and doctors about the proper course of a prisoners' medical treatment, or to conclude simple medical malpractice rises to the level of cruel and unusual punishment." Watson, 984 F.2d at 539-40. Without a sufficiently serious deprivation of medical

14

care, there can be no constitutional violation. Even bad attitude by a medical provider or a doctor's negligence in his choice of medications or treatment, which Alsina has not suggested, is not actionable under the Eighth Amendment. See Dennison at 7; see also Daniel v. Williams, 474 U.S. 327 (1986).

The record simply does not support a conclusion that there was deliberate indifference to Ocasio's medical needs. The chosen courses of action and treatment do not demonstrate recklessness or intentional conduct by any one of the co-defendants sufficient to constitute deliberate indifference. See Verser, 113 F. Supp .2d at 214-15); see also Calderon-Ortiz v. Labov-Alvarado, 300 F.3d 60, 65-66 (1st Cir. 2002); Miranda v. Munoz, 770 F.2d 255 (1st Cir. 1985). In her objections to the Magistrate Judge's Report & Recommendation, Alsina's main contention is that Ocasio's medical needs were not attended to immediately after the riot and that the delay caused a worsening of his condition. The testimony of inmates such as Felix Ramos Moulier reveals that all the inmates received treatment after the riot. The fact that it took a couple of days until Ocasio was transferred to an outside hospital where the CT scans were performed is insufficient to presume that the defendants had the recklessness or intention needed to surmise that they deliberately deprived Ocasio of the medical attention he deserved. See Verser 113 F. Supp.2d atl 214-15 (*citing* Snipes v. De Tella, 95 F.3d 586, 591 (7th Cir. 1996) (a prisoner does not have a constitutional right to choose his treatment, and a court will not second guess matters of professional judgment)); see also Navedo v. Malloney, 172 F. Supp. 2d 276, 285 (D. Mass. 2001). Alsina has not established that the chosen course of conduct was unreasonable and nothing suggests that the medical judgment in this case was misguided or that treatment was recklessly and deliberately refused. Watson, 984 F.2d at 540; Des Rosiers, 949 F.2d at 20; Navedo, 172 F. Supp. 2d at 285. Accordingly, Alsina's claims

15

against the co-defendants must be dismissed.

## CONCLUSION

Because the record fails to establish that co-defendants acted with the deliberate indifference required to trigger a constitutional violation, the Court concurs with Magistrate Judge Arena's report & Recommendation and grants the motions for summary judgment (Docket Nos. 94 and 95). Judgment shall enter accordingly dismissing the federal law claims in this case with prejudice. The state law claims are dismissed without prejudice.

IT IS SO ORDERED

In San Juan, Puerto Rico this 26th day of September, 2003.

JAY A. GARCIA-GREGORY
United States District Judge